# EXHIBIT 1

THE EASTERN CARIBBEAN SUPREME COURT
ANTIGUA AND BARBUDA

IN THE HIGH COURT OF JUSTICE

CLAIM NO. ANUHCV2023/0185
BETWEEN:

[1] FLYING DUTCHMAN OVERSEAS LIMITED
(A Company Incorporated in The Territory of The Virgin Islands)

[2] VITA FELICE LIMITED
(A Company Incorporated in The Territory of The Virgin Islands)

Applicants

**and**

[1] THE PORT AUTHORITY
(A Body Corporate Established by The Port Authority Act)
[2] THE ATTORNEY GENERAL

Respondents

**Appearances:**
Mr. Andrew O'Kola for the Applicants
Mr. Anthony Astaphan SC with Mrs. Carla Brookes-Harris, Ms. Alicia Aska, Ms. Joy Dublin, Mr. Ryan Johnson and Mr. Zachary Phillips for the Respondents

--------------------------------------
2023: May 30th, June 2nd,
June 8th
--------------------------------------

**JUDGMENT**

[1] **WILLIAMS, J.:** The Applicants by an urgent Notice of Application filed on 22nd May 2023 have applied to the Court pursuant to rule 56.3 of the Civil Procedure Rules 2000 for:

> 1. urgent interim relief to prohibit the sale or purported sale of the motor vessel 'Alfa Nero' now lying at anchor in Falmouth Harbour, Antigua ('the Vessel'); and

> 2. leave to apply for judicial review of the decisions of the Port Authority to seize and to purport to offer to sell the Vessel.

1

**Background**

[2]  At this stage of the proceedings, it is only possible to give a very broad overview of the facts which have led to these applications. It must be also borne in mind that some factual issues are disputed by the parties.  However, the largely undisputed facts are as follows:

1.  In February 2022 war erupted between Russia and Ukraine and this conflict continues to date.

2.  As a result, the United States of America, the United Kingdom, the European Union and several other states introduced sanctions targeting specified Russian entities and persons. Among these persons is Mr. Andrey Guryev a Russian businessman and his son. The exact nature of the sanctions are not clear as the actual laws/regulations which impose them are not in evidence.

3.  In or about March 2022 the M/Y Alfa Nero "the vessel" a large pleasure yacht entered Falmouth Harbour, Antigua and has remained there ever since.

4.  The First Applicant Flying Dutchman Ltd. (a BVI registered company) was registered as the owner of the yacht on the Cayman Islands registry.[1] The Second Applicant (also a BVI registered company) alleges that it is the owner of several works of art on board the vessel.[2]

5.  It seems that the Applicants are managed through a fiduciary company Opus Private Ltd. It also appears that the vessel and the works of art are ultimately owned by a discretionary trust known as the Tyne Trust which is governed by Guernsey law. Mr. Andrey Guryev although alleged not to be a beneficiary of the trust, appears to be considered to "control" the trusts within the meaning of relevant Guernsey legislation. Thus, Opus regards itself as prohibited from dealing with the trust assets except in accordance with an exception or licence.[3]

6.  On 2nd August 2022 the Office of Foreign Assets Control ("OFAC") of the US Department of the Treasury imposed sanctions on the vessel pursuant to Executive Order 14024. Accordingly, the vessel is treated as 'blocked property' of Mr. Andrey Guryev. This bars the owners of the vessel from carrying out any financial transactions in relation to it.[4]

7.  By order dated 19th August 2022 the High Court of Justice made an order to seize M/Y Alfa Nero, search and restrain the Captain from removing the vessel

---

[1] Affidavit of Shane Giles filed on 22nd May 2023, paragraph 8
[2] Affidavit of Shane Giles filed on 22nd May 2023, paragraph 12
[3] Affidavit of Shane Giles filed on 22nd May 2023, paragraphs 8-17
[4] Affidavit of Darwin Telemaque, paragraph 15

from the territorial waters of Antigua and Barbuda.[5] By order dated 26th August 2022 the High Court of Justice lifted the restriction which prevented removal of the vessel from the territorial waters of Antigua and Barbuda.[6]

8.  On 1st March 2023 it was reported in the media that the Government intended to seize and conduct a forced sale of the vessel as it is a danger to navigation.

9.  Between 1st and 31st March 2023 Mr. Justin Simon KC and Mr. Shane Giles Chief Executive Officer of Opus Private Limited attempted on many occasions to contact the Honourable Attorney General to inform him of the Applicant's ownership of the vessel ahead of the announced sale. No response was received.

10. The Port Authority (Amendment) Act "the Act" was enacted by Parliament and was published in the Gazette on 20th March 2023. The Act inserted a new section 38A into the Ports Authority Act.

11. The Port Manager published a notice in the Gazette on 21st March 2023 pursuant to section 38A (4) (b) of the Act which stated that the vessel posed an imminent threat to the harbour and to other vessels and was a risk to the economy of Antigua and Barbuda. The notice further advised that should the owner fail to take all necessary steps to remove the vessel, the Port Manager would move to sell the same.[7]

12. The same notice was published in the Lloyd's List newspaper on 28th March 2023.

13. On 3rd April 2023 Mr. Giles spoke to the Honourable Attorney General who directed him to the Port Manager Mr. Telemaque.

14. Mr. Giles emailed Mr. Telemaque on 4th April 2023 advising of the Applicant's ownership of the vessel and further advising that they were seeking the necessary licence from OFAC in order to remove the vessel. There appears to have been no response to this communication.

15. Between 4th April to 23rd May 2023 there were further media reports updating on the sale process.

16. On 8th April 2023 Mr. Telemaque emailed Mr. Giles and other persons a notice of seizure of the vessel.

17. On 13th April 2023 Peters & Peters Solicitors LLP, on behalf of the First Applicant and Opus Private Limited, wrote to the Respondents contending that any sale

---

[5] Exhibit DT1-Affidavit of Darwin Telemaque
[6] Exhibit DT 2-Affidavit of Darwin Telemaque
[7] Affidavit of Darwin Telemaque-Exhibit DT5

of the Vessel would for various reasons be unlawful. The letter sought an undertaking by 17th April 2023 to the effect that no sale of the Vessel would take place until the conclusion of the threatened litigation. There was no answer to this correspondence. The letter from Peters and Peters was also hand delivered to the Respondents on 20th April 2023.

18.  The Applicants filed the present applications on 22nd May 2023.

**Grounds of the Application**

[3]  Broadly speaking the Applicants are challenging the actions taken pursuant to the Port Authority (Amendment) Act pursuant to which the vessel was seized and is now being offered for sale. That Act inserted a new section 38A into the Port Authority Act (Cap. 333 of the Revised Laws of Antigua and Barbuda) The Applicants also purport to challenge the enactment itself on grounds of inconsistency with sections 1, 3 and 9 of the Constitution of Antigua and Barbuda.

[4]  The grounds of challenge to the enactment itself are as follows:

    4.  *"Section 38A is inconsistent with the Constitution of Antigua & Barbuda and accordingly void, because:*

        a.  *Section 38A, having been specifically enacted by Parliament in order to confiscate the Vessel from its owner, is not a provision capable of being enacted by the legislature of the 'democratic state' that section 1 of the Constitution requires Antigua & Barbuda to be; and/or*

        b.  *Section 38A infringes the Applicants' rights under sections 3 and 9 of the Constitution to the protection of the law and/or to the enjoyment of property and/or to protection from deprivation of their property without fair compensation."*

[5]  The Applicants also challenge the manner in which the powers under section 38A have been exercised as follows:

    5.  *Even if Section 38A constitutes a law validly enacted under the Constitution (which it does not for the reasons stated above), the First Respondent's decision to seize and to purport to offer the Vessel for sale pursuant to the Section 38A is unlawful because:*

        a.  *The conditions stipulated in Section 38A for the powers thereunder to arise have not been met because the Vessel is not 'abandoned' within the meaning of the section; and/or*

        b.  *The First Respondent's decision that Section 38A applies is in any event based on unreasonable conclusions of fact; and/or*

*c. Any exercise by the First Respondent of its powers under Section 38A is subject to requirements of procedural fairness that have not been complied with.*

[6] As previously noted the Applicants have also applied for an interim injunction to restrain the sale of the vessel. This is on the basis that the Applicants will suffer irreparable harm if the vessel were sold before the substantive claims are heard.

## Evidence

[7] The Applicants evidence consists of two affidavits filed on 22nd May and 1st June 2023 respectively sworn to by Mr. Shane Giles who describes himself as Chief Executive Officer of Opus Private Ltd. a fiduciary services provider based Guernsey. Opus Private Ltd. is described as the Director of the Applicants. In his affidavits Mr. Giles outlines attempts on the part of the Applicants to contact the Respondents to assert their interests in the vessel and to seek a postponement of any sale.

[8] An affidavit of Rocklyn Jeremiah a legal clerk was as filed on behalf of the Applicants. This affidavit describes a conversation with Joy Dublin counsel of the Attorney General's Chambers. It recounts that Ms. Dublin indicated that the Government would give a formal response to correspondence received from the Applicants by 23rd May 2023. However, Ms. Dublin gave no undertaking that the sale of the vessel would be postponed.

[9] Mr. Darwin Telemaque Port Manager by affidavit filed on 30th May 2023 outlines events leading up to the decision to sell the vessel. According to him the vessel had been moored at Falmouth Harbour for over a year. During this period the vessel's owners had not been able to maintain the vessel, pay for fuel, insurance, harbour charges and the salaries of the crew. Mr. Telemaque stated that if this state of affairs continues the vessel will become an environmental hazard. This among of other factors prompted him to exercise his powers under the Act and seek to sell the vessel.

[10] The Second Respondent the Honourable Attorney General swore to two affidavits filed on 30th May and 2nd June respectively. In his first affidavit the Honourable Attorney General avers that he has no powers under the Port Authority (Amendment) Act. He therefore directed all correspondence and queries in relation to the vessel to the First Respondent.   In his second affidavit the Honourable Attorney General outlines that the vessel is no longer considered 'blocked" property by the OFAC. He clarifies that this was done only to facilitate the sale of the vessel by the Government of Antigua and Barbuda.

## Applicable Law

[11] Section 38A of the Ports Authority Act was inserted into that Act via the Ports Authority (Amendment) Act. It has been confirmed that this Act was enacted by the House of Representatives and the Senate and is in force.

[12] Section 38A is central to this dispute therefore the subsections are reproduced below:

*"38A. Provisions relating to seized, detained or abandoned, vessels in harbour*

(1) Where for any reason, a ship or other seagoing vessel has been seized, detained or abandoned in any Antigua and Barbuda harbour or near any Antigua and Barbuda harbour or tidal water, the Port Manager may–

(a) take possession of the ship or other seagoing vessel; and
(b) subject to subsections (4) and (5), sell the ship or other seagoing vessel by public auction or private treaty, provided the sale is not to a sanctioned individual or entity or a person suspected of being involved in criminal activity.

(2) …………………..

(3) The proceeds of the sale of any ship or other seagoing vessel under this section—

(a) may, after allowing for deductions of expenses relating to the maintenance of the ship while berthed in the harbour, and the expenses related to the removal, storage or sale of the vessel, be forfeited to the Government and be paid into the Consolidated Fund of Antigua and Barbuda;

(b) in the case of a sanctioned vessel, shall be forfeited to the Consolidated Fund after allowing for the deductions of the expenses referenced at paragraph (a).

(4) Subject to subsection (5), the Port Manager shall not sell a vessel that has been seized, detained or abandoned-
(a) until at least sixty (60) clear days' notice has been given to the owner or agent of the vessel of the intention to exercise the power conferred by subsection (1); or

(b) ten (10) clear days notice of the intention to sell has been given to the owner or agent of the vessel in the case of a vessel which poses an imminent threat to the environment, to the safety and security of the harbour or other vessels in the harbour, or a risk to the socio-economic development of Antigua and Barbuda; and

(c) any of the circumstances outlined in subsection (5) paragraphs (a) to (d) applies.

(5) The Port Manager shall, before exercising the power under subsection (1), satisfy himself that the ship or other seagoing vessel to be sold-

(a) was seized or detained because the vessel is or is believed to be the proceeds or an instrumentality of crime;

(b) was seized or detained because the beneficial owner of the vessel or the operator of the vessel is a person that is or is believed to be the subject

6

of sanctions imposed by a country that is an ally or trading partner of Antigua and Barbuda;

(c) was at the time of its seizure or detention, involved or believed to be involved in trade or a related activity with or on behalf of a sanctioned country or person; or

(d) has been abandoned; and

(e) the vessel, if left in its current state –
   (i) will deteriorate or further deteriorate;
   (ii) is or is likely to pose a threat to the safety or security of the vessel and other vessels in the harbour;
   (iii) is causing or is likely to cause environmental damage in the harbour and its surrounding areas; or
   (iv) is or is likely to pose a threat to human health and safety.

(6) The Port Manager may defer the sale of a ship or other seagoing vessel under this section, with conditions, for a period not exceeding 60 days, where the owner or agent of the vessel is able to provide evidence to the satisfaction of the Port Manager, prior to the expiration of the notice period in subsection (4), that–
(a) steps have been initiated with the relevant authority or agency in the country that imposed the sanctions to remove the vessel or its owner from the sanctions list; or

(b) an application has been made to a court of competent jurisdiction challenging the classification of the vessel as a vessel that is owned or operated by a sanctioned person or a vessel that is the proceeds or instrumentality of crime.

(7) The notice referred to in subsection (4) shall be published in the Gazette and at least one international newspaper known for reporting on maritime affairs.

(8) …………………………………………..

(9) …………………………………………

(10) In this section –
"abandoned" refers to a situation in which a ship or other seagoing vessel that was seized or detained by any authority in Antigua and Barbuda, but which was subsequently released, has remained in or near any Antigua and Barbuda harbour or tidal water and –
(a) is not being maintained by the owner or an agent for the owner; or
(b) ownership of the vessel has been unclaimed for a period in excess of 90 days; or
(c) has outstanding moorage fees and docking charges; or
(d) is uninsured; or
(e) is or is likely to become unseaworthy; or

*(f) poses a threat to the environment, the health and safety of persons using the harbour and to the safety and security of other vessels in the harbour.*

**Issues**

[13] The issues for determination are as follows:

    A.  Whether the Applicants should be granted leave to challenge the decision of the First Respondent to seize and sell the vessel?

    B.  Whether the Applicants should be granted an interim injunction to restrain the sale of the vessel pending determination of these proceedings?

**Application for Leave to File Judicial Review Proceedings**

*Intended Proceedings Against First Respondent*

[14] The constitutional claims summarized at paragraph 4 above will be examined later in this decision. The starting point will therefore be the grounds for judicial review.

[15] According to **Halsbury's Laws of England**, *"Judicial review is the process by which the High Court exercises its supervisory jurisdiction over the proceedings and decisions of inferior courts, tribunals and other bodies or persons who carry out quasi-judicial functions or who are charged with the performance of public acts and duties."*[8]

[16] In this case the powers which have been exercised by the Port Manager have been granted pursuant to statute. An examination of the Port Manager's powers clearly indicate that when acting pursuant to section 38A of the Act he is exercising a public power. The power to seize and sell a vessel pursuant to section 38A is not a mere ability to dispose of an asset. The Port Manager before exercising this power is required to take into account wider policy considerations including the environment and the safety and security of the harbour. Accordingly, the court is satisfied that any decisions taken by the First Respondent pursuant to section 38A of the Act are susceptible to judicial review.

[17] CPR Rule 56.3 sets out the procedure for the application for leave to file judicial review proceedings. According to CPR Rule 56.4(7) after consideration of the application the judge may grant leave "on such conditions or terms as he or she considers just." The CPR does not specify the factors to be taken into account in considering whether to grant to leave. However, it is generally accepted that the test set out by the Privy Council in **Sharma** v. **Browne-Antoine** [2006] UKPC 57 is applicable.

[18] In **Sharma** v. **Browne-Antoine** the Privy Council stated at paragraph 14 of the judgment as follows:

> *"The ordinary rule now is that the court will refuse leave to claim judicial review unless satisfied that there is an arguable ground for judicial review having a realistic prospect of success and not subject to a discretionary bar such as delay or an alternative remedy: R v Legal Aid Board, Ex p Hughes (1992) 5 Admin LR 623, 628;*

---

[8] Vol. 61A (2018 ed) at paragraph 2

*Fordham, Judicial Review Handbook, 4th ed (2004), p 426. But arguability cannot be judged without reference to the nature and gravity of the issue to be argued. It is a test which is flexible in its application. As the English Court of Appeal recently said with reference to the civil standard of proof in R(N) v Mental Health Review Tribunal (Northern Region) [2005] EWCA Civ 1605, [2006] QB 468, para 62, in a passage applicable mutatis mutandis to arguability:*

> *"…the more serious the allegation or the more serious the consequences if the allegation is proved, the stronger must be the evidence before a court will find the allegation proved on the balance of probabilities. Thus the flexibility of the standard lies not in any adjustment to the degree of probability required for an allegation to be proved (such that a more serious allegation has to be proved to a higher degree of probability), but in the strength or quality of the evidence that will in practice be required for an allegation to be proved on the balance of probabilities."*

> *It is not enough that a case is potentially arguable: an applicant cannot plead potential arguability to "justify the grant of leave to issue proceedings upon a speculative basis which it is hoped the interlocutory processes of the court may strengthen": Matalulu v Director of Public Prosecutions [2003] 4 LRC 712, 733."*

[19] The Respondents also rely on the following passage from **Maharaj** v. **Petroleum Company of Trinidad and Tobago** [2019] UKPC 21 where the Privy Council stated as follows:

> *"The threshold for the grant of leave to apply for judicial review is low. The Board is concerned only to examine whether Mr Maharaj has an arguable ground for judicial review which has a realistic prospect of success: see governing principle (4) identified in Sharma v Brown-Antoine [2006] UKPC 57; [2007] 1 WLR 780, para 14."[9]*

[20] The court will apply the above propositions of law and emphasizes that all the Applicants have to demonstrate at this point are arguable grounds for judicial review which have a realistic prospect of success. Accordingly, the grounds upon which the Applicants rely will now be examined.

**Grounds of Application**

[21] The Applicants challenge the decision to seize and sell the vessel on the following grounds:

1. Non-compliance with section 38A (10) of the Act as the alleged seizure or detention took place before the Act came into force.

2. There was no seizure or detention within the meaning of section 38A (10) of the Act.

3. The seizure or detention was not undertaken by any authority within Antigua and Barbuda within the meaning of the Act.

4. Expropriation of the Applicants' property is not necessary to tackle the problem which the Respondents identify.

5. Procedural Unfairness.

---

[9] At paragraph 3

6.  The Vessel is not "Blocked" Property

*Non-compliance with section 38A (10) of the Act as the alleged seizure or detention took place before the Act came into force.*

[22] The Applicants contend that in order for section 38A (10) of the Act to be triggered, the seizure or detention relied upon by the Respondents could not have taken place before the Act came into force. In other words section 38A (10) does not have retrospective effect.

[23] In his affidavit in response Mr. Telemaque on behalf of the First Respondent refers to two orders made by the High Court in relation to the vessel and also exhibits the orders. The first order is dated 19th August 2022 and permits the authorities to search the vessel itself and articles onboard. The relevant paragraph of the order reads:

> *"The captain, the owners, the servants and or crew of the Alfa Nero are restrained from removing the vessel from the territorial waters of Antigua and Barbuda except by discharge of this court."*

[24] The order of 26th August 2022 discharged the order quoted above.

[25] The Applicants contend that statutes are '*construed as operating only on facts which come into existence after the statute was passed unless a retrospective effect is clearly intended' (see Maxwell on the Interpretation of Statutes, 12th ed, p 215, quoted and discussed by Lord Rodger in Wilson v First County Trust Ltd (No. 2) [2003] UKHL 40, [2004] A.C.816 at paras 186 and following).*

[26] It is necessary to examine section 38A (10) of the Act itself. The relevant part of the subsection reads as follows:

> *"abandoned" refers to a situation in which a ship or other seagoing vessel that was seized or detained by any authority in Antigua and Barbuda, but which was subsequently released, has remained in or near any Antigua and Barbuda harbour or tidal water….."*

[27] Thus in order for the Port Manager to exercise his powers of seizure and sale pursuant to section 38A (10) the vessel in question must have been seized or detained and then subsequently released. This is a pre-condition before the Port Manager can take any steps pursuant to the statute. The question therefore does the Act refer to a vessel seized or detained before the Act came into force?

[28] The basic principle of statutory interpretation is that effect must be given to the clear words of the statute. **Section 36(1**) of the **Interpretation Act** (Cap. 224) states:

> *"Every enactment shall be construed as always speaking and if anything is expressed in the present tense it shall be applied to the circumstances as they occur so that effect may be given to each enactment according to its true spirit, intent and meaning."*

[29] In relation to section 38A (10) quoted above in relation to seizure or detention the subsection refers to a vessel that "<u>was seized or detained</u>". Thus, the section speaks in the past tense and

can only refer to a state of affairs which existed before the statute came into force. Therefore, the presumption against retrospectivity and the presumption contained in section 36(1) of the Interpretation Act are rebutted by the clear words of the statute. This ground therefore has no realistic prospect of success and is hereby dismissed.

*There was no seizure or detention within the meaning of section 38A (10) of the Act.*

[30] The Applicants argue that the order of 19th August 2022 which barred the vessel from leaving the territorial waters of Antigua and Barbuda was not a seizure or detention for the purposes of section 38A(10) of the Act. They state that the order means that the vessel could traverse an area measuring several square miles without breaching the order.

[31] As previously stated it is a pre-condition before the vessel can be deemed "abandoned" within the meaning of section 38A (10) it must have been previously been seized or detained. If the vessel has not been seized or detained then presumably the First Respondent would be acting ultra vires the Act.

[32] Although the terms "seized" or "detained" are not defined in the Act these terms are well-known to the law. In **Eastenders Cash and Carry plc** v **Revenue and Customs Commissioners** [2014] UKSC 34 the UK Supreme Court conducted a thorough review of the related but distinct concepts. Seizure was described as *"the first stage of a statutory process leading to forfeiture."* [10] In relation to detention the court held as follows:

> *"Detention is a temporary assertion of control over the goods, which does not necessarily involve any seizure with a view to ultimate forfeiture. What is the purpose of detaining goods without seizing them? The obvious answer is to enable the goods to be examined, or secured pending investigations which might lead to their seizure later."* [11]

[33] Accordingly, it is clear that the vessel was detained pursuant to the order of 19th August 2022 as no further steps were taken to forfeit it at that time. The Central Authority exercised temporary control over the vessel in order to conduct their searches pursuant to the order. It matters not that the vessel could have traversed the waters of Antigua and Barbuda once it remained under the control of the relevant authorities. This detention came to an end with the order of 26th August 2022. Accordingly, this ground is dismissed.

*The seizure or detention was not undertaken any authority within Antigua and Barbuda within the meaning of the Act.*

[34] The Applicants submit that even if there was a seizure or a detention, this was not in any true sense done by an authority in Antigua & Barbuda. It was done pursuant to a mutual legal assistance treaty. The authority in question was not in Antigua & Barbuda but in the United States.

---

[10] At paragraph 18
[11] At paragraph 19

[35] The orders of 19th and 26th August 2022 were made by the High Court of Justice. The High Court of Justice is constituted as part of the judicial branch of the government of Antigua and Barbuda by virtue of the Supreme Court Order. The provisions of the Supreme Court Order itself are incorporated by reference into the Constitution of Antigua and Barbuda and some of these provisions are deeply entrenched.[12]

[36] It matters not that the applications for seizure or detention of the vessel were made pursuant to the **Mutual Legal Assistance in Criminal Matters (Government of Antigua and Barbuda and Government of the United States of America) Ratification Act.**[13] Although the Act incorporates the mutual legal assistance treaty between Antigua and Barbuda and the United States of America into domestic law, it does not permit the authorities of one state to exercise jurisdiction in another. The treaty merely provides a framework for the state parties to combat transnational crime. Accordingly, this ground is dismissed.

*Expropriation of the Applicants' property is not necessary to tackle the problem which the Respondents identify.*

[37] The Applicants submit that there are alternatives available to the First Respondent otherwise than proceeding to sell their property pursuant to section 38A of the Act. In particular, they refer to section 100(1) of the **Environmental Protection and Management Act 2015** which makes it a criminal offence to discharge sewage into the harbour. They also refer to section 210 of the **Merchant Shipping Act** which entitles the harbour authorities to remove any vessel that is 'sunk, stranded or abandoned' from the Harbour. In similar fashion the Applicants also rely on section 36 of the **Port Authority Act** which permits the arrest of ships in respect of which harbour rates or charges are owing.

[38] In **Attorney General** v. **Kenny D. Anthony** (SLUHCVAP2009/0031) the Court of Appeal stated as follows:

> *"It is now settled that the Courts have jurisdiction to question a decision made by a public authority. The jurisdiction is purely supervisory in the sense that the Court's role is limited to ensuring that the decision was lawfully made. The Court cannot act as an appellate body to question the decision on the merits, even if it thinks that the wrong decision was made."*[14]

[39] In this case the First Respondent may have had the option to take action pursuant to other statutes. However, to require the First Respondent to do so would be going outside the scope of the court's functions in a judicial review application. This court would in effect be substituting its views for that of the decision-maker. This is not permissible. Accordingly, this ground is dismissed.

---

[12] Constitution of Antigua and Barbuda-Section 47
[13] Act No. 12 of 2000
[14] At paragraph 55

*Procedural Unfairness*

[40] The Applicants argue that there has been procedural unfairness in the manner which the First Respondent is proceeding with the seizure and sale of the vessel. The Applicants submit that in the present case, fairness requires that at a minimum there must be some willingness to engage with the owners of the vessel which it is proposed to seize and sell. In this regard, the Applicants point out that "The Port Authority and the Government have resolutely refused to engage at all with FDOL concerning the fate of the Vessel."[15]

[41] The Applicants rely on the following passage of the Privy Council decision in **Public Service Commission v Richards** *[2022] UKPC 1:*

'It is sufficient to refer to two leading statements about the duty to act fairly. First, in *R v Secretary of State for the Home Department, ex p Doody* [1993] UKHL 8; [1994] AC 531, a case concerning the procedure to be followed by the Secretary of State in setting tariff periods of mandatory imprisonment for prisoners serving life sentences, Lord Mustill said (p 560):

*"What does fairness require in the present case? My Lords, I think it unnecessary to refer by name or to quote from, any of the often-cited authorities in which the courts have explained what is essentially an intuitive judgment. They are far too well known. From them, I derive that (1) where an Act of Parliament confers an administrative power there is a presumption that it will be exercised in a manner which is fair in all the circumstances. (2) The standards of fairness are not immutable. They may change with the passage of time, both in general and in their application to decisions of a particular type. (3) The principles of fairness are not to be applied by rote identically in every situation. What fairness demands is dependent on the context of the decision, and this is to be taken into account in all its aspects. (4) An essential feature of the context is the statute which creates the discretion, as regards both its language and the shape of the legal and administrative system within which the decision is taken. (5) Fairness will very often require that a person who may be adversely affected by the decision will have an opportunity to make representations on his own behalf either before the decision is taken with a view to producing a favourable result; or after it is taken, with a view to procuring its modification; or both. (6) Since the person affected usually cannot make worthwhile representations without knowing what factors may weigh against his interests fairness will very often require that he is informed of the gist of the case which he has to answer."[16]*

[42] The Respondents counter that the Applicants have failed to take section 38A (4) and 38A (6) of the Act into consideration. Section 38A (4) of the Act requires the First Respondent to give notice of the intention to seize or sell any vessel pursuant to the relevant provisions. In oral submissions Mr. Astaphan SC counsel for the Respondents indicated that the First Respondent acted

---

[15] Applicant's Submissions-Paragraph 2
[16] At paragraph 30

pursuant to section 38A(4)(b) of the Act when notice was published in the Gazette and the Lloyd's List newspaper of the intention to seize and sell the vessel.

[43] Section 38A (4) (b) of the Act permits the First Respondent to give ten days' notice of his intention to seize and sell a vessel where he is satisfied that *"an imminent threat to the environment, to the safety and security of the harbour or other vessels in the harbour, or a risk to the socio-economic development of Antigua and Barbuda"* exists. This must be coupled with the existence of any of the circumstances outlined in section 38(5) (a) to (d) of the Act.

[44] The Respondents further note that section 38A (6) permits the First Respondent to defer a sale of a vessel. However, this power can only be exercised if within the ten-day period specified in section 38A (4) (b) and if the owner of the vessel or his agent satisfies the First Respondent that:

> (a) steps have been initiated with the relevant authority or agency in the country that imposed the sanctions to remove the vessel or its owner from the sanctions list; or

> (b) an application has been made to a court of competent jurisdiction challenging the classification of the vessel as a vessel that is owned or operated by a sanctioned person or a vessel that is the proceeds or instrumentality of crime.

[45] The First Respondent argues that the Applicants had not complied with section 38A (6) of the Act. This is as the Applicants had not requested a deferral of the sale of the vessel nor had they provided any evidence that steps were being taken in any country to remove the vessel or its owner from any sanctions imposed.

[46] It is clear that section 38A (1) of the Act grants exclusive power to the First Respondent to seize and sell the vessel. Further by virtue of section 38A (6) of the Act only the First Respondent can defer the sale of the vessel if satisfied that the applicable conditions have been met.

[47] In order to determine whether a prima facie case of procedural unfairness has been established it is necessary to examine the available evidence. The affidavit of Shane Giles in support of the Application exhibits an email between himself and the First Respondent of 4th April 2023.[17] That email outlines the First Applicant's purported ownership of the vessel and restates previous efforts to contact the Respondents. Crucially in its penultimate paragraph the email states, *"Indeed we already possess licences from the Guernsey authorities to Manage and maintain the vessel and, as I briefly described to you yesterday, we are seeking to obtain the necessary licence from OFAC to enable the vessel to be funded, maintained and finally made seaworthy again."*

[48] Section 38A (7) required that the notice of intention to sell the vessel must be published in the Gazette and in a leading newspaper specializing in maritime affairs. According to the affidavit of the First Respondent the Gazette notice was published on 21st March 2023 and the publication in Lloyds List took place on 28th March 2023. These notices have also been exhibited.

[49] The Court accepts that the First Respondent could only defer the sale of the vessel acting pursuant to section 38A (6) of the Act. Section 38A (4) (a) of the Act requires ten clear days' notice to be given before the power of sale can be exercised. Thus, the last date for the Applicants to have been legally able to notify the First Respondent that they had applied for the

---

[17] Paragraph 23 of Affidavit of Shane Giles filed on 19th May 2023

lifting of the applicable sanctions would have been 8th April 2023. Thus, the email of 4th April 2023 was submitted within the time-limit specified by section 38A (6) of the Act.

[50] Mr. Telemaque on behalf of the First Respondent does not deny receiving the email of 4th April 2023. Mr. Telemaque also does not indicate whether he responded to the said communication or not. Mr. Telemaque at paragraph 28 of his affidavit simply states that the Applicants did not request a deferral of up to sixty days neither did they provide evidence of the correspondence to OFAC. He therefore concludes that there was no evidence to satisfy him that steps had been taken pursuant to section 38A (6) of the Act.

[51] Section 38(A) of the Act does not expressly impose a duty on the First Respondent to engage with anyone claiming to be the owner of an abandoned vessel. However, the court is satisfied that such a duty is implied in the interests of fairness as outlined in the case of *R v Secretary of State for the Home Department, ex p Doody* quoted above. In particular a person hoping to benefit from section 38A (6) of the Act should be informed of the "*gist of the case which he has to answer*" in order to make proper representations.

[52] In this case section 38A(6) of the Act does not specify exactly what evidence is required to satisfy the First Respondent that steps are being taken to remove the vessel or its owners from any sanctions list. This is a matter to be determined by the First Respondent. However, it is certainly arguable that having received correspondence from the Applicants, fairness dictated that the First Respondent should have indicated that he was not satisfied with the evidence presented at that point.

[53] Therefore, the Applicants have a realistic prospect of success in judicial review proceedings on the ground of procedural unfairness as outlined in their application. Accordingly, leave will be granted to file judicial review proceedings against the First Respondent on this ground.

*The Vessel is not Blocked Property*

[54] The Applicants argue that the vessel is no longer deemed to be "blocked" property by OFAC. Mr. Giles in his supplemental affidavit also questions the nature and extent of any sanctions imposed in relation to the vessel. The Honourable Attorney General in his affidavit of 2nd June 2023 states that the designation has been lifted by OFAC. However, this was only to facilitate the sale of the vessel by the Government of Antigua and Barbuda.

[55] At this stage of the proceedings the court is prohibited from resolving significant disputes of fact. The issue of sanctions may involve an examination of the relevant foreign laws which are not before the court at this stage. These issues are better left to be determined at the substantive hearing of the claim. The issue of sanctions is relevant as it would determine whether the proceeds of any sale are forfeited into the Consolidated Fund in accordance with section 38A (3) of the Act. Accordingly, leave will also be granted to the Applicants to challenge the First Respondent's decision on this ground.

**Alternative Remedies**

[56] The Applicants have not complied with CPR Rule 56.3(3) (e) in that they have not addressed the issue of whether an alternative remedy exists. This is mandatory requirement of the rules. However, fortunately no sanction applies for non-compliance.

[57] The court pointed counsel for the Applicants to CPR Part 70 which governs Admiralty Claims. It was inquired from counsel to whether or not Admiralty Claim would be an adequate alternative remedy? This is especially as such a claim would enable to the Applicants to assert their claims of ownership. Counsel could not clearly indicate why an Admiralty Claim was not an adequate alternative remedy.

[58] However, it is noted that in any Admiralty Claim the Respondents would probably be able to assert that they intend to seize and sell the vessel pursuant to statute. This may indeed be a complete defence to the claim. Accordingly, in the exercise of my discretion I have granted leave in respect of the grounds indicated in the order below.

## Proceedings Against the Second Respondent

[59] As previously observed the Port Authority (Amendment) Act confers the powers of seizure and sale upon the First Respondent. There is no mention at all of the Attorney General having any role to play in the seizure and sale of vessels pursuant to the statute.

[60] The first affidavit of Shane Giles at paragraph 38 clearly states that in a conversation with the Honourable Attorney General on 3rd April 2023 the Honourable Attorney General referred him to the First Respondent. The Honourable Attorney General himself states at paragraph 7of his first affidavit as follows:

> *"Consequently, in accordance with the law, I directed that all correspondence and queries in the matter be directed to the Port Manager the officer vested by the Port Authority (Amendment) Act with the authority to deal with matters related to the M/Y Alfa Nero."*

[61] The Privy Council in **Minister of Foreign Affairs, Trade and Industry v Vehicles and Supplies** (1991) 39 WIR 270 ruled that judicial review proceedings were to be brought against the decision-maker.[18] The Honourable Attorney General has made no decision in this matter therefore no proceedings can issue against him. Accordingly, this application is dismissed as against the Second Respondent.

## Constitutional Claims

[62] The Applicants have challenged the Port Authority (Amendment) Act on the grounds that it is contrary to sections 1, 3 and 9 of the Antigua and Barbuda Constitution. At the hearing of the application, I expressed doubt to counsel for the Applicants as to whether the constitutional relief especially declarations as to the unconstitutionality of primary legislation are available in judicial review proceedings. This is as CPR Rule 56.7 requires constitutional claims must be commenced by an Originating Motion supported by an affidavit.

[63] Counsel for the Applicants referred to the recent Privy Council decision of **Jean Rony-Jean Charles v. Carl Bethel** [2022] UKPC 51 which considered the issue of whether constitutional

---

[18] At page 281

relief was available in Habeas Corpus proceedings. In ruling in the affirmative the Judicial Committee stated as follows:

> "More specifically, the Board in interpreting equivalent provisions in the Guyanese Constitution has emphasised the clear intention of the Constitution that a person who alleges that his or her fundamental rights are threatened or have been contravened should have unhindered access to the court: Jaundoo v Attorney General of Guyana [1971] AC 972, 982-983 per Lord Diplock. In so holding the Board quoted, at 983, with approval from the judgment of Warrington J in In re Meister, Lucius and Brüning Ltd (1914) 31 TLR 28, 29 in which he stated:
>
>> "where the Act" (sic Constitution) "merely provides for an application and does not say in what form that application is to be made, as a matter of procedure it may be made in any way in which the court can be approached."
>
> Lord Diplock recognised one qualification to that statement, which is relevant in this case when the Board turns to consider the challenge to the fairness of the procedure which Hilton J adopted. Lord Diplock stated (p 983):
>
>> "There is only one qualification needed to this statement. It is implicit in the word 'redress'. The procedure adopted must be such as will give notice of the application to the person or the legislative or executive authority against whom redress is sought and afford to him or it an opportunity of putting the case why the redress should not be granted."
>
> He added that did not prevent the court from making conservatory orders ex parte before notice was given if the urgency of the case so required.[19]

[64] The court has also had regard to the case of **Leroy King** v. **Attorney General** (ANUHCVAP2017/0011) from this jurisdiction. In that case an Originating Motion had been filed seeking relief under the Constitution and also sought judicial review remedies. The learned judge dismissed the judicial review aspect of the claim as no leave had been obtained. The Appellant then subsequently filed an application for leave. The learned judge thereupon granted leave and heard the constitutional and judicial review matters together. On appeal the Court of Appeal ruled that this was a proper exercise of the court's case management powers.[20]

[65] This instant case is the reverse. There is no claim before the court as a substantive claim cannot commence unless leave is granted. Further, **Jean Rony-Jean Charles v. Carl Bethel** the Respondents require an opportunity to adequately put the case as to why constitutional redress should not be granted. This would be better be served if the Applicants commence a claim seeking constitutional redress in accordance with CPR Rules 56.7(2) and 56.7(4)(c).

[66] The matter does not end there. Since leave has been granted in respect of two aspects of the Applicants application, if constitutional redress is sought by the Applicants, I would hear the two claims together following the Court of Appeal's guidance in **Leroy King** v. **Attorney General**.

---

[19] At paragraph 22
[20] At paragraphs 26 to 28

**Application for Interim Injunction**

[67] The Applicants are seeking an interim injunction to restrain the sale of the vessel pending the hearing of these proceedings. At paragraphs 18 and 34 of the written submissions the Applicants submit that the vessel is not an ordinary commercial chattel. The Applicants imply that if the Respondents' actions are found to be unlawful the Respondents would have committed the tort of conversion.

[68] In terms of remedies the Applicant's rely on the following passage from *Clerk and Lindsell on Tort* which states as follows:

> "that orders for redelivery'[...] will not usually be made in respect of ordinary articles of commerce for which damages would provide adequate compensation, save where the defendant is insolvent and so refusing specific relief would effectively expropriate the claimant. But [the authors go on] they are apt to be granted for unique or sentimental items, articles of particular value to the claimant, and things not easily or readily replaceable, or whose replacement would take considerable time and effort. Even here, however, the court retains a general discretion to refuse relief where appropriate, for example to prevent prejudice to third party interests, promote human or animal welfare, or to safeguard human rights.'

[69] In oral submissions the counsel for the Applicants further submitted that the vessel had sentimental value to the beneficiaries of the trusts. Accordingly, damages would not be an adequate remedy.

[70] The Applicants in both their written and oral submissions state that they have not merely an arguable case but a strong case that the sale of vessel would be unlawful. They rely on the Privy Council decision in **Belize Alliance of Conservation Non-Governmental Organisations v Department of the Environment (Interim Injunction)** [2003] UKPC 23 to the effect that the strength of the parties case should be taken into account even at an interlocutory stage.

[71] The Respondents have resisted the application for an interim injunction firstly on the grounds that any order in relation to the vessel would be contrary to the sanctions which have been imposed. Secondly, any interim order would increase the risk of environmental damage being caused to Falmouth Harbour by the deteriorating vessel. Further, the Government would continue to incur significant costs in relation to maintenance of the vessel.

[72] The Respondents rely on the longstanding authority of **Smith** v. **ILEA** [1978] 1 ALL ER 411 where Lord Denning outlined the principles applicable to interim injunctions in public law. Lord Denning stated:

> "*But without going into detail, I am of opinion that a local authority should not be restrained, even by an interlocutory injunction, from exercising its statutory powers or doing its duty towards the public at large, unless the plaintiff shows that he has a 'real prospect of succeeding in his claim for a permanent injunction at the trial. In this case I fear that I see no real prospect of the parents succeeding at the trial.*"[21]

---

[21] At page 418

[73] The Court of Appeal in **Beryl Isaac** v. **The Grenadian Hotel** (GDAHCVAP2017/0002) summarized the relevant principles as follows:

> (a) *In considering an application for an interim injunction in which there is a public law element in issue, the approach to be adopted is the application of the guidelines outlined in American Cyanamid with the necessary modifications appropriate to the public law element.*
>
> (b) *The public law element is a special factor in considering the balance of justice and the court has a wide discretion to take the course which seems most likely to minimize the risk of an unjust result.*
>
> (c) *Where the dispute is between a public authority and a quasi-public authority, an injunction may be granted to the quasi-public body without any undertaking in damages.*
>
> (d) *It is an exceptional course for the court to restrain a public authority from enforcing an apparently valid law. A court would only take such course where having regard to all of the circumstances of the case the court is satisfied that the challenge to the validity of the law is prima facie firmly based and adoption of such an exceptional course is justified.*
>
> (e) *A public authority acting within the law should be permitted to exercise its functions and duties for the benefit of the public.* [22]

[74] On the basis of above, the starting point is the authority of **American Cyanamid** v. **Ethicon** [1975] AC 396 as further supplemented by **National Commercial Bank** v. **Olint** [2009] UKPC 16. In that case the Privy Council stated as follows:

> *"The purpose of such an injunction is to improve the chances of the court being able to do justice after a determination of the merits at the trial. At the interlocutory stage, the court must therefore assess whether granting or withholding an injunction is more likely to produce a just result. As the House of Lords pointed out in American Cyanamid Co v Ethicon Ltd [1975] AC 396, that means that if damages will be an adequate remedy for the plaintiff, there are no grounds for interference with the defendant's freedom of action by the grant of an injunction. Likewise, if there is a serious issue to be tried and the plaintiff could be prejudiced by the acts or omissions of the defendant pending trial and the cross-undertaking in damages would provide the defendant with an adequate remedy if it turns out that his freedom of action should not have been restrained, then an injunction should ordinarily be granted.*
>
> *In practice, however, it is often hard to tell whether either damages or the cross-undertaking will be an adequate remedy and the court has to engage in trying to predict whether granting or withholding an injunction is more or less likely to cause irremediable prejudice (and to what extent) if it turns out that the injunction should not have been granted or withheld, as the case may be. The basic principle is that the court should take*

---

[22] At paragraph 12

> *whichever course seems likely to cause the least irremediable prejudice to one party or the other. This is an assessment in which, as Lord Diplock said in the American Cyanamid case [1975] AC 396, 408:*

>> *"It would be unwise to attempt even to list all the various matters which may need to be taken into consideration in deciding where the balance lies, let alone to suggest the relative weight to be attached to them."*

[75] Thus, the factors to be considered are:

> 1. Whether there is a serious to be tried?
> 2. Where does the balance of convenience lie?
> 3. Whether damages would be adequate?

*Serious Issue to be Tried*

[76] In **American Cyanamid** v. **Ethicon** [1975] AC 396 the principle of a serious issue to be tried was stated as follows:

>> *"There was no rule of law that the court was precluded from considering whether, on a balance of convenience, an interlocutory injunction should be granted unless the plaintiff succeeded in establishing a prima facie case or a probability that he would be successful at the trial of the action. All that was necessary was that the court should be satisfied that the claim was not frivolous or vexatious, i.e. that there was a serious question to be tried".*

[77] With respect to judicial review proceedings the following except from the text **Judicial Remedies in Public Law**[23] relied on by the Applicants in my view accurately summarizes the position:

>> *"A Claimant can only be granted permission to apply for judicial review if he can establish an arguable case that the measure under challenge is unlawful. If a claimant cannot establish an arguable case and permission for judicial review is refused, the claim for an interim injunction will inevitably fail."*

[78] In this case I have already decided that the Applicants have a realistic prospect of success in challenging the First Respondent's decision to seize and sell the vessel on grounds of procedural unfairness and the applicability of sanctions. Therefore, I am satisfied there are serious issues to be tried.

*Balance of Convenience*

[79] In his affidavit on behalf of the First Respondent the Port Manager Mr. Darwin Telemaque outlines that Falmouth Harbour is located within a designated National Park. He then goes on to specify that the harbour is located in close proximity to coral reefs, seagrass beds and mangroves which host marine life. Thus, the area is ecologically sensitive. He then reveals that a spare part

---

[23] Judicial Remedies in Public Law (6th Ed.) at paragraph 8-027

for the vessel's onboard sewage plant has been unavailable since March 2022, thus untreated sewage is being discharged into the harbour since then. This has not been disputed by the Applicants.

[80] In terms of the vessel itself Mr. Telemaque relies on an affidavit by former Captain Lewis which outlines the condition of the M/Y Alfa Nero as at August 2022. In addition to the inoperable sewage treatment plant, fire extinguishers and pumps may not be in working order due to lack of maintenance. The vessel is also not insured and has been deregistered. Further, Captain Lewis observes that the vessel is undermanned with only five (5) crew members remaining out of total complement of twenty-eight (28). Again, this has not been disputed by the Applicants.

[81] Mr. Telemaque concludes that if no urgent or immediate action is taken to rehabilitate the vessel and remove it from the harbour its condition will continue to deteriorate. The Applicants for their part have given no timeline as to when the vessel can be removed from Falmouth Harbour.

[82] In the circumstances due to the risk of damage to the environment and the further risks to navigation identified in the almost uncontroverted evidence of Mr. Telemaque the balance of convenience weighs heavily in favour of not restraining the sale of the vessel. I further note that the Applicants have given the usual undertaking in damages. However, I have doubts that in the event an injunction was improperly granted that the Applicants would be able to pay such damages due to any sanctions.

*Adequacy of Damages*

[83] The authorities note that adequacy of damages is not the decisive factor in consideration of whether or not to grant an injunction in public law. In this case for the sake of completeness I have observed that the Applicants have provided no evidence to indicate why damages would not be adequate. In the case of the vessel as a luxury vessel it may have sentimental value to the persons who regularly enjoy it. However, as an oceangoing vessel it would certainly have a monetary value for insurance purposes in cases of damage or destruction. In his first affidavit Mr. Giles estimates the vessel to be valued at US 100 million dollars.[24] Similarly, the art onboard the vessel said to be owned by the Second Applicant, would certainly be able to be appraised in cases of damage, destruction or theft. In his first affidavit Mr. Giles estimates the works of art to be worth US$214,000.[25]

[84] Thus, if the Applicants are ultimately successful in their substantive claim it would not be difficult to assess any damages payable to them. These damages would most likely be based on the replacement value of the vessel and the works of art. The Court therefore finds that damages would be an adequate remedy in the circumstances.

[85] In all the circumstances the court will exercise its discretion and refuse the grant of an injunction.

**Order**

[86] Based on the foregoing, it is hereby ordered as follows:

---

[24] Affidavit of Shane Giles paragraph 8
[25] Affidavit of Shane Giles paragraph 12

1. The Applicants are hereby granted leave to file judicial review proceedings to challenge the decision of the First Respondent to offer the vessel M/Y Alfa Nero for sale on grounds of procedural unfairness and the non-applicability of sanctions as alleged in the Applicants' Notice of Application filed on 22nd May 2023.

2. All other grounds contained in the Applicants' Notice of Application filed on 22nd May 2023 are dismissed.

3. The Application against the Second Respondent is dismissed in its entirety.

4. The Applicants are to file a Fixed Date Claim for Judicial Review in accordance with paragraph 1 hereof within fourteen (14) days of this order.

5. Should the Applicants elect to seek constitutional relief concerning this matter any Originating Motion filed will be heard together with the substantive claim for Judicial Review.

6. The Application for an Interim Injunction to restrain the sale of the M/Y Alfa Nero is refused.

7. No order as to costs.

[87] Finally, I wish to express my gratitude to counsel for their helpful submissions.

**Rene Williams**

**High Court Judge**

**By the Court**

**Registrar**