# EXHIBIT 9

12/4/24, 5:29 PM
Bruce Rappaport sells shares in offshore bank | OffshoreAlert
Case 1:25-mc-00098-JMF    Document 4-9    Filed 03/11/25    Page 2 of 4



OCTOBER 31, 2002

# Bruce Rappaport sells shares in offshore bank

The Bank of New York's one-time biggest single shareholder, Bruce Rappaport, no longer controls shares in Antigua-licensed Global Bank of Commerce Ltd., formerly known as Swiss American Bank Ltd.

Antigua's International Financial Sector Regulatory Authority approved a change of ownership at a meeting on December 18, 2001.

The buying shareholders were Brian Stuart-Young, 75 per cent; Vere Hill, 20 per cent; and Christopher Williams, five per cent.

The selling shareholder was Swiss American Holding Co. S. A., a Panama-registered firm ultimately beneficially owned by Rappaport, who was appointed Antigua's Ambassador to Russia in 1997.

"Bruce Rappaport has zero interest or beneficial ownership in the present bank," said Stuart-Young, the bank's Chairman and CEO.

"He has no direct association or in-direct representation in the shareholding, board or management of the bank, nor any bank account with it."

The change of ownership came not long before the bank finally won a civil lawsuit filed in 1997 by the United States Government at Federal Court in Massachusetts.

The U. S. was trying to recover $7 million from defendants Swiss American Bank, Swiss American National Bank, Swiss American Holdings S. A. and Inter-Maritime Bank.

It was claimed this amount was deposited in accounts controlled by convicted New England drug traffickers and that the U. S., rather than the Antiguan government, was entitled to the illegal proceeds.

The action finally ended on April 19, 2002 when the United States Court of Appeals for the First Circuit affirmed the district court's ruling that the U. S. did not have jurisdiction.

"The Bank's local Board and management were exhaustively involved in dealing with these litigation issues over the years, yet never lost confidence that the Bank would be vindicated and its reputation restored," said the bank's Chairman and CEO, Brian Stuart-Young.

"This led to an initiative by management to buy the bank, which was well supported by its customers and the domestic community.

"The new owners are putting in place a new business model for the Bank and changed its name to Global Bank of Commerce to better reflect its role in e-commerce and international business."

Additionally, the new name "has helped to distance the institution from the negative publicity that was unfairly associated with Swiss American", said Stuart-Young.

Manage consent

"Any party that actually visits the Bank today and takes the time to review our operations will find that we have been very pro-active in meeting all the current requirements for KYC and MLP standards.

"In fact, well before the recent demands under the USA PATRIOT Act, the Bank operated a strong compliance program and had undergone a third party review by PWC, installed money laundering prevention software, and fully subscribed to the Wolfsburg Principles.

"As an Antiguan owned and operated institution it has pursued best practices that have earned the respect of its banking regulators and correspondent banking relationships."

Commenting on the legal battle with the U. S. Government, he said: "In some reporting it was termed as a landmark case in money laundering, but it was really a landmark case in jurisdictional issues.

"As a result, the merits of the case were never fully ventilated as the Courts took over four years to rule, twice at the District Court level and twice at the appeal Court for the First Circuit, that the US Government failed to make a prima facie showing of specific or general jurisdiction.

"You may recall that the case was about events that took place between 1985-1987. This was a time when international financial centers had little, if any, regulations or experience regarding the reporting of suspicious activity and the treatment of illicit funds.

"The bank was then run by Peter Herrington and the Board expressed concern over his management of an account in the name of Guardian Bank.

"The Bank had alerted in writing (an SAR) both the local and US authorities to the suspicious nature of the account, and the Board also fired its General Manager for cause related to this matter.

"The true beneficial ownership of this Anguilla-formed Guardian Bank was clouded as it was owned by other bearer-share offshore companies.

"The account was actually controlled by the then General Manager. After he was fired, a US citizen named John Fitzgerald claimed ownership of the account and in 1989 caused a suit to be brought against SAB by Guardian.

"It was heard in Antigua's High Court and eventually the Judge ruled that the ownership of Guardian was not established.

"Fitzgerald's lawyer was unable to present bearer shares that represented ownership, or demonstrate that Fitzgerald controlled the account as a signatory or director.

"On the filing of the Bank's SAR, the funds on the account were frozen by Antigua's Ministry of Finance, which was then SAB's supervisory authority.

"Subsequently, in accordance with Antiguan laws that govern the abandonment of an account, the funds amounting to a little over $5 million were turned over to the Antigua Government.

"These funds represented the balance of the deposits made to the account, less withdrawals and the payment of legal fees to restrain the funds from being further depleted.

"In 1994, it appears that Fitzgerald was arrested and in a plea bargain said that he had deposited funds amounting to $7 million at SAB.

"The Bank actually wrote the Court and advised that the account was already the subject of a court decision, and the funds were the frozen by the Government.

"Nonetheless, the US Court made a forfeiture order. To complicate matters further, Fitzgerald then died in prison.

"The US sought to obtain the forfeited funds from the Government but there were no asset sharing agreements in place, nor was there appropriate legislation to permit the application of an external forfeiture order.

"In frustration, the US brought this civil action against the Bank in December 1997, basically accusing SAB of conversion of the funds on account, by handing it over to the Antiguan authorities.

"SAB moved to have it dismissed on the grounds of lack of jurisdiction. The District Court of Massachusetts agreed and dismissed the case in September, 1998, holding that neither the Massachusetts long-arm statute nor Federal Rule of Civil Procedure Rule 4[k] [2] provided personal jurisdiction over the bank.

"On appeal, the First Circuit held there was no personal jurisdiction over the bank pursuant to the long-arm statute, but set forth a new methodology and analysis to be followed in applying Rule 4[k] [2] and remanded the case to the District Court.

"Under this Rule, the Department of Justice must show that the Bank's activities in the US are sufficient to satisfy the constitutional minimum contacts standard for personal jurisdiction.

"This requires proof that SAB had systematic and continuous contacts in the US. It is not sufficient to establish general jurisdiction by pointing to occasional contacts over a long period. In fact, SAB did not maintain any agents, representatives or offices in the US.

"There were oral arguments made before the District Court's Chief Judge, William G. Young, on March 30, 2000, in which the litigation was seen as a landmark case on personal jurisdiction, and the hearing was actually conducted at the New England School of Law, rather than the Court.

"The Judge could either dismiss it again or allow the US to take limited discovery. In the latter instance, that would then require a further decision on whether the results of the discovery should lead to having the case heard or dismissed.

"If the decision were made that it should be heard, the merits of the case could actually be judged. SAB was always been confident that the merits of the case would rest in its favor, especially as the case was not a money laundering issue but a matter of which sovereign nation had the correct authority to confiscate the funds.

"The District Court's decision was finally issued on September 29, 2000. In the Memorandum and Order given by Chief Judge Young it states – "Indeed, so 'bootless' is the government's showing here in light of the applicable authority, that it has made no colorable claim to entitle it to any further discovery" The Court allowed SAB's motion to have the case dismissed.

"The DOJ again appealed the decision and it was not until December 27 2001 that the Appellate Court entered its judgment to affirm the decision by the District Court.

"Any further appeal would have carried the case to the Supreme Court, but on March 25 2001 the DOJ advised the Court of Appeals that it would not be seeking a rehearing. The Court then affirmed its judgment on April 19 2002."

Copyright© 1997-2021 OffshoreAlert. All Rights Reserved. www.offshoreelert.com